UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

XL SPECIALTY INSURANCE
COMPANY,

       Plaintiff / Counterclaim-Defendant

       - v -

PRESTIGE FRAGRANCES, INC.,

       Defendant / Counterclaim-Plaintiff.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 733 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In this action, Plaintiff and Counterclaim-Defendant XL Specialty Insurance Company seeks a declaration that three successive insurance policies it issued to Defendant and Counterclaimant Prestige Fragrances, Inc. are rescinded and void <u>ab initio</u> and that, as a result, it has no obligation to pay Prestige for losses that Prestige incurred in connection with a theft from Prestige's warehouse. (Am. Cmplt. (Dkt. No. 47)) Prestige has counterclaimed, seeking a declaration that the policies are not void and that XL Specialty is obligated to cover losses from the warehouse theft, and contending that XL Specialty has breached its obligations under the most recently issued insurance policy. (Third Am. Counterclaim (Dkt. No. 48)) Plaintiff moved for summary judgment on its claims in the Amended Complaint and Defendant's counterclaims. (Mot. (Dkt. No. 54))

       In a September 30, 2019 Order, this Court granted Plaintiff's motion only to the extent that it found that the insurance policies at issue constitute maritime contracts that are governed by federal admiralty law. Plaintiff's motion was otherwise denied. <u>See</u> Sept. 30, 2019 Order (Dkt. No. 73).

The purpose of this memorandum opinion and order is to explain the Court's reasoning.

## BACKGROUND

I. **FACTS**

Plaintiff XL Specialty is an insurer that offers marine cargo insurance. (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 1) Defendant Prestige is a wholesale distributor of brand name fragrances and cosmetics. (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 2)[1] Although most of Prestige's customers are located in the United States (Third Am. Counterclaim (Dkt. No. 48) at 12 ¶ 4; Sunkara Dep. (Dkt. No. 63-2) at 77), 50 to 60 percent of the goods it sells are imported, and 99 percent of this merchandise is shipped to Prestige via ocean-going vessels. (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 12; Sunkara Dep. (Dkt. No. 63-2) at 77) Prestige stores its imported cargo and domestic goods at its warehouse in Hillsborough, New Jersey. (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 4)

A. **Prestige's Insurance Coverage and Loss History**

Beginning in 2005 – when Prestige first began importing goods transported by ocean-going vessels – the company procured marine cargo insurance from Indemnity Insurance Company of North America. (Sunkara Dep. (Dkt. No. 63-2) at 80) In June 2010, Prestige's warehouse in Hillsborough was burglarized;[2] thieves broke through a wall between the warehouse and an adjacent vacant building. (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 42; Def. R. 56.1

---

[1] Unless otherwise indicated, the facts discussed in this memorandum opinion are undisputed.

[2] At the time of the burglary, Prestige's warehouse was located at 219 Homestead Road in Hillsborough. (See June 2010 Indemnity Insurance Claim (Dkt. No. 63-6) at 41) In 2012, Prestige moved its inventory to a warehouse located at 6 Jill Court in Hillsborough. (See Def. Ex. 45 (Dkt. No. 63-8) at 31; Sunkara Dep. (Dkt. No. 63-2) at 91; Def. Resp. to Pltf.'s R. 56.1 Stmt. (Dkt. No. 65) ¶ 42)

Counterstmt. (Dkt. No. 65) ¶ 42)  Prestige reported the burglary to Indemnity Insurance and to Hartford Insurance Company of the Midwest, its commercial property insurer.  Prestige claimed that it had lost inventory worth $790,642.97, and suffered $331,321.14 in losses of business personal property and due to business interruption.  Indemnity Insurance settled Prestige's inventory loss claim in full; Hartford Insurance also settled Prestige's business income loss and business personal property claims in full.  (June 2010 Indemnity Insurance Claim (Dkt. No. 63-6) at 41-49; June 2010 Hartford Insurance Claim (Dkt. No. 63-6) at 51-61)  In September 2010, Indemnity Insurance ceased providing marine cargo insurance coverage to Prestige.  According to Rao Sunkara, Prestige's chief executive officer, Indemnity elected to discontinue coverage "[d]ue to the [June 2010] burglary issue."  (Sunkara Dep. (Dkt. No. 63-2) at 81-82)

In September 2010, Prestige obtained marine cargo insurance coverage from Allianz, also known as AGCS Marine Insurance Company.  (Id. at 85)  While Allianz served as Prestige's insurer, Prestige submitted two claims:  a March 2012 loss resulting from a freight forwarder's mishandling of cargo; and a January 2013 loss resulting from a shortage of cargo upon delivery of inventory.  (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶¶ 47-48, 50-51)  Prestige claimed a $52,576.71 loss in connection with the March 2012 incident, and obtained $37,576.71 from Allianz.  Prestige claimed a $29,000.98 loss in connection with the January 2013 incident, and obtained $14,000.98 from Allianz.  (Id. ¶¶ 49, 52; see also March 2012 Loss Claim (Dkt. No. 63-6) at 63-70; Jan. 2013 Loss Claim (Dkt. No. 63-6) at 72-80)

**B.**     <u>The 2014, 2015, and 2016 XL Specialty Insurance Policies</u>

      **1.**     <u>Frenkel & Company's Producer Agreement with XL Specialty</u>

Frenkel & Company is a marine insurance broker. (<u>See</u> Frenkel Website (Dkt. No. 63-6) at 83) In 2013, Frenkel entered into an "Insurance Producer Agreement" (the "Producer Agreement") with XL Specialty. (Producer Agreement (Dkt. No. 63-6) at 97-110)

The Producer Agreement authorizes Frenkel to "periodically submit risks to [XL Specialty] for its consideration," but Frenkel has "no right to bind [XL Specialty], [or to] alter or cancel any coverage in the absence of specific authorization to do so." (Producer Agreement (Dkt. No. 63-6) at 97) The Producer Agreement does grant Frenkel "the authority and the responsibility" to:

1. Collect, account for and pay to [XL Specialty] premiums, fees and other charges . . . for business placed with [XL Specialty] . . . ;

2. Deposit premiums collected on behalf of [XL Specialty] . . .[;]

. . .

4. Transmit to [XL Specialty] . . . premiums collected on behalf of [XL Specialty;]

5. Receive and report promptly to [XL Specialty] all known or reported claims, losses, or notices thereof, made pursuant to the terms of any binder, certificate of insurance, or insurance policy issued by or on behalf of [XL Specialty;]
. . . .

(<u>Id.</u> at 97-98)

The Producer Agreement further provides that "[t]he . . . commission . . .earned by [Frenkel] shall be negotiated between the parties with regard to each insurance proposal accepted by [XL Specialty] hereunder." (<u>Id.</u> at 99)

With respect to Frenkel's "[s]tatus" <u>vis</u> <u>a</u> <u>vis</u> XL Specialty, the Producer Agreement provides that "[Frenkel] acknowledges that it is an agent of the insured and not an agent of [XL

Specialty]. [Frenkel] will at all times act solely in the capacity of a broker on behalf of the insureds. [Frenkel] has no authority to bind coverage on behalf of [XL Specialty]." (Id. at 100)

The Producer Agreement includes a mutual indemnity and release provision in which, inter alia, Frenkel "agree[s] to indemnify, defend and hold harmless [XL Specialty] . . . against all liability for losses, costs and expenses of whatsoever kind . . . which [XL Specialty] . . . may incur (i) by reason of any breach and/or misuse of the limitations, authorizations, responsibilities, or instructions contained in this [Producer] Agreement, (ii) in enforcing any covenants and conditions of this Agreement, or (iii) arising out of the willful or negligent acts or omissions of [Frenkel], its employees or its agents with respect to the business involved under this Agreement." (Id. at 103)

## 2. **Procurement of the 2014 XL Specialty Policy**

In September 2014, Frenkel began soliciting Prestige for its marine cargo insurance business. On or before September 4, 2014, Frenkel employees Steven Lauria and Frank Doria met with Prestige CEO Sunkara at Sunkara's office. (Lauria Dep. (Dkt. No. 63-6) at 3; Sunkara Dep. (Dkt. No. 65-8) at 6 (recalling a meeting with a Frenkel representative in "late August or September"))[3] On September 4, 2014, Lauria (copying Doria) emailed Anne Jones – who manages Frenkel's Cargo Department – asking her to "provide a stock throughput policy"

---

[3] Sunkara recalls that only Doria was at this initial meeting, but a September 4, 2014 email suggests otherwise. (Dkt. No. 63-6 at 89) On that day, Lauria, copying Doria, attempted to email Sunkara (he included a typo in the recipient address) requesting, "per [their] conversation," certain basic information from the company – including Prestige's annual insurance premium and rate, deductibles for cargo and warehousing, the countries from which Prestige imported goods and those to which Prestige exported goods, and the number of import and export shipments Prestige had per month. (Dkt. No. 63-6 at 89) On September 5, 2019, Doria forwarded the email to Sunkara's correct email address, and Sunkara responded with answers later that day. (Id. at 88)

for Prestige.[4]  Lauria told Jones that Prestige "stated no losses."  (Votinelli Dep. (Dkt. No. 63-6) at 30); Sunkara Dep. (Dkt. No. 65-8) at 7, 8; Lauria Dep. (Dkt. No. 63-6) at 6)

According to Lauria, at the meeting with Sunkara, he asked Sunkara about prior claims Prestige had made under cargo insurance policies.  (Lauria Dep. (Dkt. No. 63-6) at 6)  Lauria does not specifically recall what Sunkara said.  Lauria believes, however, that Sunkara told him that Prestige had made no prior claims, because Lauria "brought the information [he] gathered from Prestige" to Jones, and "would have discussed the loss history, if there were any known losses" with her.  He and Jones had no such discussion.  Indeed, Lauria told Jones that Prestige had "stated no losses."  (<u>Id.</u> at 3, 6)  Sunkara testified, however, that he never told any Frenkel employee that Prestige had experienced no cargo losses.  (Sunkara Dep. (Dkt. No. 65-8) at 8)

On September 5, 2014, Frenkel employee Tom Votinelli sent the following email to Angela Nolan, an XL Specialty underwriter:

> Hi Angela, I have another one for you. . . .
> – Prestige currently has cargo cover w/ Allianz – through Aon; anniversary is 9/25/14.  Please be as aggressive as you can.
> – This is smaller than the one we worked last couple weeks.  So there's no competition . . . outside of whomever incumbent broker is going to.  But don't believe they are marketing this on their end.
> Let me know if interested, I understand the account is currently loss free. . . .

---

[4]  According to Frenkel employee Tom Votinelli, "stock throughput" policies "provide seamless coverage for [an insured's] inventory from . . . purchase or through transit to its ultimate, final destination."  Such policies "cover the policyholder's goods or inventory while those goods or inventory [are] in a warehouse."  But these policies do "not also cover other contents of the warehouse."  (Votinelli Dep. (Dkt. No. 63-6) at 29)

(Dkt. No. 65-15 at 7)[5]  Votinelli's "understanding that Prestige was currently loss free" was premised on "a prior email that [he had] received from Anne Jones."  (Votinelli Dep. (Dkt. No. 63-6) at 32)

In response to Votinelli's email, Nolan asked, <u>inter</u> <u>alia</u>, "[h]ow long has the account been loss-free for?  Any chance you have hard copy loss runs?"  Votinelli replied, "I'll see what I can get, but may not be able."  Nolan forwarded Votinelli's response to XL Specialty employee Ray Bartels, noting that Votinelli "never answered the loss question which is iffy.  We can always make our quote subject to hard copy company loss runs."  (Sept. 5, 2014 Email Exchange (Dkt. No. 65-15) at 5-10)[6]

On September 8, 2014, Nolan emailed Bartels and Andrew D'Alessio, XL Specialty's Vice President for National Cargo Practice, with risk modeling results for Prestige.  Nolan noted that the "[a]ccount is currently loss-free," but added that she would record "hard copy loss runs as quote subjectivity."[7]  (<u>Id.</u> at 4)  D'Alessio responded, "This is a fine risk.  I would confirm the loss history."  Bartels agreed.  (<u>Id.</u> at 3)  Nolan drafted a quote, and on September 9, 2014 – after receiving comments and revisions from Bartels and D'Alessio – she

---

[5]  Votinelli also sought a coverage quote from Navigators Management Company, Inc., another carrier.  (Sept. 5, 2014 Votinelli Email (Dkt. No. 63-6) at 92)

[6]  A loss run is "a report generated by an insurance company that gives the loss history; it will show claims made, [and] claims actually paid."  (Votinelli Dep. (Dkt. No. 63-6) at 34; <u>see also</u> Lauria Dep. (Dkt. No. 63-6) at 7 (loss runs "provide[] a picture, over a period of time, of what the insurer paid out in losses for a particular insured"; loss runs are prepared by the carrier))  Insurers typically seek loss history information because this data helps carriers in rating risk.  (Votinelli Dep. (Dkt. No. 63-6) at 34)  According to Votinelli, Prestige's loss history was "important information that XL [Specialty] needed."  (<u>Id.</u> at 39)

[7]  A "subjectivity" is "[s]omething that needs to be resolved before coverage can be executed."  (Lauria Dep. (Dkt. No. 65- 13) at 4; <u>see also</u> D'Alessio Dep. (Dkt. No. 63-7) at 14 ("A subjectivity is an item listed on the written quotation . . . that is outstanding, and the insurance offering is contingent to receiving that piece of information."))

sent the quote to Votinelli.  (Sept. 9, 2014 Email (Dkt. No. 65-14) at 2; Sept. 9, 2014 Email (Dkt. No. 65-15) at 2-3)

XL Specialty's quote for providing cargo insurance to Prestige was "based upon the information received in the submission provided by Tom Votinelli on September 5, 2014," and was "subject to . . . [h]ard copy 5-year loss runs prior to binding."  (XL Specialty Quote (Dkt. No. 63-7) at 26)  XL Specialty's quote contemplates coverage of "[g]oods . . . consisting principally of genuine fine fragrances and cosmetics"; a $7,000 annual premium; deductibles in the amount of $1,000 generally, but $2,500 for a "warehouse storage coverage loss"; and a $2 million limitation of liability for "shipments by any one vessel and connection conveyances, or in any one place at any one time," and a $5 million limitation on liability for Prestige's warehouse at 6 Jill Court, in Hillsborough, New Jersey.  (Id. at 26-27)

Lauria, Doria, and Sunkara met on September 11, 2014, to discuss XL Specialty's quote.  (Sunkara Dep. (Dkt. No. 63-2) at 87; Lauria Dep. (Dkt. No. 63-6) at 7)  They discussed "the key aspects of the quote," including the loss runs subjectivity.  (Lauria Dep. (Dkt. No. 63-6) at 7)  Lauria does not recall "if he specifically . . . asked for loss runs," but he "would have instructed [Sunkara] that [Sunkara] needed to gather [the loss information] from his prior carrier."  (Id.)  Sunkara testified that there was "discuss[ion] about [Prestige's] losses" at the meeting, and that he told the Frenkel employees about Prestige's 2010 burglary loss, and about the two cargo losses.[8]  (Sunkara Dep. (Dkt. No. 63-2) at 87-88)  Sunkara did not provide "any

_____

[8]  While Lauria does not recall whether Sunkara disclosed Prestige's prior losses and insurance claims at the September 11, 2014 meeting (Lauria Dep. (Dkt. No. 63-6) at 8), Lauria sent an email to Sunkara the next day asking for a description of the cargo claims.  (Sunkara Dep. (Dkt. No. 63-2) at 89)

dollar amount or . . . any complete description of the[se] losses" at this meeting, however. (Id. at 88)

That same day – September 11, 2014 – Votinelli asked Nolan to bind the quote, effective September 25, 2014. (Sept. 11, 2014 Email (Dkt. No. 63-7) at 29) Nolan thanked Votinelli for the business but asked him, "[a]ny chance you obtained the 5-year company loss runs yet?" She noted that "[b]inder confirmation . . . [would] follow shortly thereafter." (Sept. 11, 2014 Email (Dkt. No. 63-7) at 31) Votinelli responded, "[n]o company loss runs," but represented that Prestige was "putting something together on Prestige letter[]head" concerning its loss history. (Sept. 11, 2014 Email (Dkt. No. 63-7) at 33) Votinelli had not spoken with anyone at Prestige about preparing a document on Prestige letterhead to confirm its loss history, however, and he does not believe that any other Frenkel employee had asked Prestige to create such a document. (Id.) Votinelli forwarded his email exchange with Nolan to Lauria and Doria, and commented: "XL are being sticklers on Loss History." (Sept. 11, 2014 Email (Dkt. No. 63-7) at 38)

According to Votinelli, insurance carriers are typically willing to accept – in lieu of loss runs – "a letter provided to the insurance company on the prospective insured's letterhead" concerning loss history. (Votinelli Dep. (Dkt. No. 63-6) at 38) These letters would either state that "there are in fact no losses, or[,] if there are losses[,] [the letters] state[] what the losses are." (Id.) XL Specialty's D'Alessio testified that "sometimes in place of a loss run or loss history provided by the previous carrier or carriers, . . . insurance carriers will accept a letter on the letterhead of the policy holder, which says . . . . that there [are] no known or reported losses, and for the last five years." (D'Alessio Dep. (Dkt. No. 63-7) at 7) Where the prospective policyholder's letter lists prior losses, however, a loss run is generally required: "there is no

prohibition [against] policyholders or new applicants [who] have losses, but [the losses] [are] usually declared . . . via a loss history or loss run."  (Id.)  D'Alessio further testified that XL Specialty understood from Votinelli's email that "Prestige would provide a letter stating that Prestige had no losses for the five years prior to 2014."  (D'Alessio Decl. (Dkt. No. 59) ¶ 8)

After receiving Votinelli's response, Nolan confirmed that the Prestige policy (the "2014 Policy") – was bound effective September 25, 2014.[9]  (Sept. 11, 2014 Email (Dkt. No. 63-7) at 33)

The 2014 Policy – described on the policy's cover page as an "Ocean Marine Cargo" policy (2014 Policy (Dkt. No. 63-3) at 2) – is an "[o]pen and continuous [policy] . . . covering all shipments on and after the inception date [of September 25, 2014] . . . until the policy is cancel[]ed."  (Id. at 13)  The goods insured under the 2014 Policy "consist[] principally of Genuine Fine Fragrances and Cosmetics . . . shipped by or to the insured or by or to others for the insured's account or control or shipments in which the insured may have an interest"  (id.), and the 2014 Policy "covers all shipments . . . at and from ports and/or places in the world to and at ports and/or places in the world directly or via ports and/or places in any order, including transshipment by land, air, water, or otherwise," as well as "[t]he fifty . . . states of the United States, the District of Columbia, the United States Virgin Islands, Canada, . . . Puerto Rico," and "U.S. Inland and Coastal Waterways. . . ."  (Id. at 14)  Although the 2014 Policy's "Conveyance Clause" covers goods transported both by ocean-going vessel and by aircraft or by air  (id. at 16), the terms used in the policy primarily concern maritime shipping.  (See id. at 16 (describing

---

[9]  The record before this Court includes an undated document entitled "Underwriting Rationale." The document appears to have been created by or for Nolan for purposes of a risk referral, because the "cargo limits of liability exceed[ed] [her] underwriting authority."  The document states that Prestige "is loss free – 5 years *Our quote is subject to hard copy 5-year company loss runs prior to binding.*"  (2014 Underwriting Rationale (Dkt. No. 63-7) at 35)

coverage for "on deck cargo" and "containerized cargo" on board an ocean vessel); id.
(providing that shipments in, e.g., "metal-hulled, self-propelled vessels" are covered, and
"excluding [shipments on] vessels built . . . for service on the Great Lakes"); id. at 18 (providing
for "shore coverage"); id. at 21 (describing coverage for "ex-dock" purchases and sales); id. at
22 (excluding coverage for vessels not in compliance with international maritime shipping
standards))

The premium for the 2014 Policy is $7,000. The 2014 Policy further provides
that XL Specialty "shall not be liable under this insurance for more than $2,000,000 in respect of
shipments by any one vessel and connecting conveyances, or in any one place at any one time."
(Id. at 13-14) The deductible is $1,000 "[f]or each occurrence giving rise to a claim." (Id. at 13)

The 2014 Policy contains a "Warehouse to Warehouse" clause, which states that
the insurance "attaches from the time the goods leave the Warehouse and/or store . . . for the
commencement of the transit and continues during the ordinary course of transit . . . until the
goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance
continues whilst the goods are in transit and/or awaiting transit until delivered to the final
Warehouse at the destination named in the policy. . . ." (Id. at 19) The 2014 Policy also contains
a "Marine Extension Clause," which supersedes the Warehouse to Warehouse Clause wherever
the two clauses conflict, and pursuant to which "insurance attaches from the time the goods leave
the Warehouse . . . for the commencement of the transit and continues until the goods are
delivered to the final Warehouse." (Id. at 20) The 2014 Policy also includes a "Warehousing
Coverage Endorsement," which extends coverage to Prestige's warehouse at 6 Jill Court in
Hillsborough, New Jersey. (Id. at 27) This warehouse coverage "attach[es] immediately upon
termination of [XL Specialty's] liability under the terms of the Warehouse to Warehouse and

Marine Extension Clauses and . . . continue[s] from that time until the property is exported from the warehouse[] . . . at which time the Warehouse to Warehouse and Marine Extension Clause[s] re-attach." (Id.) Pursuant to the Warehouse Coverage Endorsement, the deductible for warehouse storage loss claims is $2,500, and the limit of liability for goods covered at the warehouse pursuant to the Warehouse Coverage Endorsement is $5 million.[10] (Id. at 27-28)

Finally, the 2014 Policy contains the following choice of law provision: "It is hereby agreed that any dispute arising hereunder shall be adjudicated according to substantive United States Federal Admiralty law and practice[,] but where no such law and practice exists, this policy is subject to the substantive laws of the State of New York." (Id. at 25)

On September 12, 2014, the day after the policy was bound, Lauria emailed Sunkara, asking him to "please remember to send [Lauria] the description of the cargo claims," and to "note the year of the occurrence." (Sept. 12, 2014 Email (Dkt. No. 63-7) at 40) There is no evidence that Sunkara responded to this email, and no evidence that XL Specialty – in the weeks and months after the 2014 Policy was bound – made any further requests for documentation confirming Prestige's loss history.

On February 4, 2015 – five months later – D'Alessio informed Nolan that he had been assigned to audit the Prestige account. After stating that he had "missed the fact that [XL Specialty] should arrange [for an on-site] survey," and requesting that Nolan ask Votinelli for a contact through whom a survey could be arranged, D'Alessio observed that "the quote [for the Prestige policy] had a 5[-]year loss run subjectivity." D'Alessio asked Nolan to "please upload that if possible." (Feb. 4, 2015 Email (Dkt. No. 65-16) at 2)

---

[10] The deductible for warehouse storage loss claims "arising from windstorm, earthquake or flood" is $5,000. (2014 Policy (Dkt. No. 63-3) at 28)

Later that day, Nolan sent an email to Votinelli stating that "our quote subjectivity of 5-year loss runs for Prestige isn't on file." She continued: "I remember you saying that loss info would be provided on company letterhead. Is this available?" She also asked for a contact through whom an on-site survey could be arranged. (Feb. 4, 2015 Email (Dkt. No. 65-17) at 2)

Less than a half-hour later, Votinelli sent an email to Sunkara, informing him that the underwriters at XL Specialty had contacted him with two requests: (1) for either a letter confirming that Prestige had had no losses over the past five years, or five-year loss runs from the previous cargo insurance carrier; and (2) contact information for someone who could arrange for an on-site survey of Prestige's warehouse. Votinelli received no response. (Feb. 11, 2015 Email Chain (Dkt. No. 65-18) at 2)

On February 11, 2015, after receiving a follow-up email from Nolan, Votinelli again emailed Sunkara, asking him to "[p]lease urgently advise," and warning that "[b]oth items are necessary in order to continue coverage." (Id. at 2 (emphasis in original); Dkt. No. 65-19 at 3) Votinelli then replied to Nolan, saying that he had "[s]poke[n] with [insured], he told me he would have both items this week." (Dkt. No. 65-19 at 3)

That same day, Sunkara spoke by telephone with Votinelli. Votinelli told Sunkara that he could "put . . . on Prestige letterhead . . . whatever the losses [were]." (Sunkara Dep. (Dkt. No. 65-8) at 10) Sunkara maintained no repository for Prestige's loss claims; accordingly, he had to resort to his email database for details concerning Prestige's loss and claim history. (Id. at 10-11) On February 13, 2015, Sunkara sent the following email to Votinelli: "This is to confirm that [Prestige] had a claim in March 2013 for $14,000 towards missing cargo in the last five years." (Id. at 12) Sunkara did not report either Prestige's 2012 cargo loss nor the 2010 burglary of Prestige's warehouse. Sunkara testified that he "totally

forgot about the 2012 cargo loss," and accordingly, did not look for information concerning that

claim in his email database.  As for the 2010 burglary, Sunkara "didn't forget about it, but

didn't" think of the burglary as having taken place within the previous five years.  (Id. at 12-13)

  Votinelli did not forward the information in Sunkara's email to XL Specialty, and

on March 16, 2015, Nolan asked Votinelli for an "update on the Prestige loss history & contact

information."  (March 16, 2015 Email (Dkt. No. 65-19) at 3)  Votinelli responded by providing

Sunkara's contact information and the address of the Prestige warehouse, and said he would

"follow[]up for loss history."  (Id. at 2)  Votinelli did not provide any additional loss history

information to XL Specialty, however; nor did XL Specialty arrange a survey of the Prestige

warehouse in 2015.

  On July 17, 2015, Votinelli contacted Sunkara to request information relevant to

the upcoming renewal of the 2014 Policy.  Votinelli asked Sunkara to, inter alia, confirm that

there had been "no known or unreported losses."  (Sunkara Dep. (Dkt. No. 65-8) at 13-14)

Sunkara understood Votinelli to be asking for information regarding losses within the period of

the 2014 Policy.  (See id.; see also Votinelli Dep. (Dkt. No. 65-12) at 9 ("[I]n preparation for a

renewal, you really just concern yourself with . . . the prior year."))  Sunkara confirmed that there

were "no known or unreported losses" during the period of the 2014 Policy.

  On August 6, 2015, Votinelli emailed Nolan "updated figures for the upcoming

renewal."  Votinelli informed Nolan that there were "[n]o known or unreported losses."  (Aug. 6,

2015 Email Chain (Dkt. No. 65-20) at 3)  On September 8, 2015, Votinelli requested that Nolan

provide the terms of the renewal, and on September 9, 2015, Nolan sent a renewal quote to

Votinelli.  She also noted that XL Specialty "would like to order a warehouse survey this year, at

our expense, so please provide contact information when you can." She did not request any additional loss history information, however. (Id. at 2)

The 2015 renewal quote states that it is "based upon the information received in the submission provided by Tom Votinelli on September 8, 2015," and that XL Specialty "reserves the right to amend th[e] quotation if there is any material change to the information provided in the submission." (2015 Renewal Quote (Dkt. No. 63-7) at 59) Unlike the September 2014 quote, the September 2015 quote does not condition the policy's binding on receipt of loss runs; instead, the 2015 Renewal Quote states that the policy is subject to receipt of the "insured's contact information in order [to conduct] a warehouse survey." (Id.) On September 16, 2015, Votinelli requested that the policy be bound; two days later, Nolan confirmed that the 2015 Policy was bound.[11] (Dkt. No. 63-8 at 2) The 2015 Policy is substantively identical to the 2014 Policy. (See 2015 Policy (Dkt. No. 63-4))

A number of months later, Nolan realized that Prestige's warehouse had not yet been surveyed. Accordingly, on April 19, 2016, XL Specialty arranged for Regional Reporting Inc. ("RRI") to conduct a survey of Prestige's warehouse. (Apr. 18, 2016 Email Chain (Dkt. No. 65-21) at 2-3) On April 29, 2016, Kimberley Karalovich – an RRI loss control consultant – emailed Sunkara, explaining that

> [t]he underwriter for [Prestige's] policy has requested [an] inspection/survey to help them determine the type of risk involved with your company and goods in storage. The questions are designed to confirm general information and to assess how goods are stored and the securities in place. If there are uncontrolled hazards . . . then I would write recommendations to help reduce the likelihood of los[s].

(Apr. 29, 2016 Email (Dkt. No. 65-30) at 2)

---

[11] An "Underwriting Rationale" for the 2015 renewal states that Prestige "is loss free coming up on six years." (2015 Underwriting Rationale (Dkt. No. 63-8) at 6)

Karalovich conducted a survey of Prestige's warehouse at the end of April or early May 2016.[12]  According to RRI representative Allan Myers, this warehouse survey "was for the purpose of assisting XL to underwrite the risk for Prestige."  (Myers Dep. (Dkt. No. 65-3) at 4)  Sunkara was present for the survey.  Karalovich "asked [him] questions about how [Prestige] take[s] care of the security systems,[and] what measures [it] [had] taken to secure . . . the warehouse."  She also asked Sunkara about prior losses Prestige had suffered at the warehouse. Sunkara testified that he "explain[ed] to her about the theft, the previous theft . . . and then [he] described how it happened," telling her that the thieves "broke the wall between [a] vacant warehouse and . . . [Prestige's] warehouse."  Sunkara also told Karalovich about security measures Prestige had taken since the burglary, including moving the warehouse to a new location, and persuading the new building's landlord to install security features in the warehouse walls.  (Sunkara Dep. (Dkt. No. 65-8) at 15)

After conducting the warehouse survey, RRI prepared a report for XL Specialty.  RRI Rpt. (Dkt. No. 63-8) at 33-48)  RRI concluded that, overall, the warehouse risk was "average." RRI's only recommendation to Prestige concerned the warehouse's sprinkler system.  (RRI Rpt. (Dkt. No. 63-8) at 39, 48)  As to "loss exposures," the report states that "[a]nything . . . could be a cause of loss to inland marine property . . . [e].g. fire, smoke, heat, water, theft, insect & vermin, etc[.].  The greatest exposure for loss would be due to breakage or theft. . . . To reduce the likelihood of theft, large shipments are[] digitally sealed, tracked and are photographed.  The

<hr />

[12]  The RRI report states that the survey was conducted on April 27, 2016, and the parties assert in their Local Rule 56.1 statements that the survey took place on that day.  See Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 156; Def. R. 56.1 Counterstmt.  (Dkt. No. 65) ¶ 156.  Karalovich's email to Sunkara appears to have initiated the survey, however, and her email was not sent until April 29, 2016.  (Apr. 29, 2016 Email (Dkt. No. 65-30) at 2)  Accordingly, the survey may have taken place in early May 2016.

risk also required the building owner to install[] motion sensors in the walls of [] adjacent units." (Id. at 35)

In a section addressing "loss information," the report states that "[t]he insured had a loss of about $200,000 about 4 years ago when someone broke through a wall in the adjacent vacant unit. Since then the insured moved to a different section in the building and has the walls equipped with motion detect[ors]/sensors." (Id. at 39) RRI submitted its report to XL Specialty on May 8, 2016. (See May 9, 2016 Email (Dkt. No. 63-8) at 31) Nolan accessed the report the next day, May 9, 2016. (Oct. 4, 2018 Email (Dkt. No. 65-4) at 2)

On August 9, 2016, Nolan emailed Votinelli, seeking updated information for the upcoming renewal of the Prestige policy. In an August 15, 2016 email, Votinelli stated that Prestige wanted the current $5 million limit on liability for Prestige's warehouse increased to $7 million. Votinelli also represented that there were "[n]o known or unreported losses." (Aug. 15, 2016 Email Chain (Dkt. No. 63-8) at 11; see also Aug. 1, 2016 Email (Dkt. No. 63-8) at 9) Two days later, Nolan sent Votinelli a quote for the policy renewal. (Aug. 17, 2016 Email (Dkt. No. 63-8) at 16) The quote for the 2016 Policy states that it "is based upon the information received in the submission provided by Tom Votinelli on August 15, 2016," and that XL Specialty "reserves the right to amend this quotation if there is any material change to the information provided in the submission."[13] (2016 Quote (Dkt. No. 63-8) at 17) The quote for the 2016 Policy provides for an $8,500 premium. (Id. at 18)

Shortly after sending Votinelli the quote, Nolan emailed to herself Votinelli's August 15, 2016 email, along with certain comments, including the following: "RNL Rationale:

_____

[13] In its summary of covered locations, the quote reflects the requested increased coverage for Prestige's warehouse. The increased coverage is not reflected in the "Limitation of Liability" section of the quote, however. (2016 Quote (Dkt. No. 63-8) at 17-18)

No known or unreported losses.  LOSS HISTORY IS CLEAN LAST 7 YEARS.  Only change is warehouse limit increase from $5M to $7M. [W]arehouse location in NJ – not a critical EQ or WS zone."  (Aug. 17, 2016 Email (Dkt. No. 63-8) at 13)

Nolan resigned from XL Specialty on August 17, 2016.  On August 19, 2016, D'Alessio informed Votinelli of Nolan's resignation, and said that he would be handling the renewal of the Prestige policy.  (Aug. 19, 2016 Email (Dkt. No. 63-8) at 20-21)  That same day, D'Alessio opened the RRI survey report.  (Oct. 4, 2018 Email (Dkt. No. 65-4) at 2)  D'Alessio testified that he accessed the RRI report at that time because the renewal of the Prestige policy had – as a result of Nolan's resignation –  become his responsibility, and "it would have been [his] practice to review the complete file," including the survey report.  (D'Alessio Dep. (Dkt. No. 65-6) at 24)

D'Alessio further testified that XL Specialty does not "us[e] a[n] RRI survey . . . as a way to gain loss information," but instead "rel[ies] on the loss information from the broker through prior loss runs, or loss history."  The on-site surveys are designed "to proactively prevent losses in the future . . . and see if the warehouse owner . . . has made any changes that would help avoid future losses . . . and/or if there [are] any . . . recommendations . . . so that propensity for loss is mitigated."  (D'Alessio Dep. (Dkt. No. 63-7) at 13)  According to D'Alessio, XL Specialty "do[es]n't really look at th[e] [loss history] section [of survey reports,] because the loss is declared to [XL Specialty] through the insurance broker."  (Id.)  D'Alessio appears not to have noticed the 2010 $200,000 loss discussed in RRI's report.[14]

---

[14]  D'Alessio also testified – implausibly – that the description of the 2010 loss in the RRI report does not make clear that the loss is a theft loss:

On September 7, 2016, Votinelli requested that XL Specialty bind the Prestige renewal, per the terms of the 2016 quote. (Sept. 7, 2016 Email (Dkt. No. 63-8) at 20) The 2016 Policy was bound that day, effective September 25, 2016. (Id.; Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 19) The 2016 Policy differs from the previous policies in that the limit of liability for coverage under the Warehousing Coverage Endorsement is increased to $7 million, and Prestige's premium is increased to $8,500. (2016 Policy (Dkt. No. 63-5) at 15, 30)

Over the July 4, 2017 holiday weekend, thieves broke into Prestige's warehouse, and stole goods valued at more than over $1.2 million. (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 4; Third Am. Counterclaim (Dkt. No. 63-2) at 29 ¶ 27) Prestige informed Frenkel of the theft, and on July 10, 2017, Frenkel notified XL Specialty. Frenkel told XL Specialty that "it appears that this matter could end up being in the area of $1M, plus." (July 10, 2017 mail (Dkt. No. 63-2) at 93) Prestige's claim for the July 2017 theft ultimately amounted to $1,271,740. (Claim Summary (Dkt. No. 63-2) at 107)

---

Q: Okay. So the RRI surveyor indicates to XL that, "Someone broke through a wall in the adjacent vacant unit, and the [insured] had a loss of about $200,000." Correct?

A: They do, but they don't indicate if that is a theft loss, or is it a personal property loss, or a real property loss, or something like that.

Q: Well, do you not interpret breaking through the wall, and then having a $200,000 loss, as a theft event?

A: It doesn't, specifically, say.

Q: Is it your sworn testimony, that you would not use common sense, and interpret someone breaking through the wall, and the policyholder having a $200,000 loss, as a theft event?
. . . .

A: Again, it does not say that it was a theft event.

(D'Alessio Dep. (Dkt. No. 65-6) at 26)

XL Specialty investigated the circumstances of the July 2017 theft, and in a January 26, 2018 letter, XL Specialty informed Prestige that it "hereby denies and disclaims coverage under policies issued to Prestige . . . for losses Prestige asserts it has incurred in connection with [the] July 4, 2017 theft." In this letter, XL Specialty also "rescinds each of the . . . [Prestige] [i]nsurance [p]olicies and [asserts that] those policies [are] void <u>ab</u> <u>initio</u>." (Jan. 26, 2018 Ltr. (Dkt. No. 63-2) at 97) XL Specialty provides the following reasoning for its actions:

> In investigating the July 4, 2017 Theft Loss, XL Specialty discovered that Prestige misrepresented and failed to disclose to XL Specialty material information when Prestige sought and applied for coverage under the [Prestige] Policies. In particular, in response to XL Specialty's requests for information regarding Prestige's prior losses, Prestige misrepresented and failed to disclose . . . Prestige's prior theft losses, and at least one insurance claim related to those losses. . . . XL Specialty's decision to issue the Policies on the terms offered was made in reliance on the truth, accuracy and completeness of the information Prestige provided to XL Specialty in connection with XL Specialty's underwriting the Policies. If Prestige's loss and claim history had been fully and accurately disclosed to XL Specialty, XL Specialty would not have issued the Policies or would have offered to issue the Policies on different terms.

(<u>Id.</u> at 97-98)

## II.    <u>PROCEDURAL HISTORY</u>

XL Specialty initiated this action on January 26, 2018 – the same day that it denied Prestige's claim and rescinded the insurance policies it had issued to Prestige. In the Complaint, XL Specialty seeks a declaration that the policies it issued to Prestige are void <u>ab</u> <u>initio</u>. (<u>See</u> Cmplt. (Dkt. No. 1)) Prestige counterclaimed, seeking a declaration that XL Specialty is obligated to cover Prestige's losses from the July 4, 2017 theft. Prestige also asserts a counterclaim for breach of contract, and requests consequential damages, attorneys' fees, and litigation costs in connection with its counterclaims. (Second Am. Counterclaim (Dkt. No. 21)) XL Specialty moved to dismiss Prestige's counterclaims to the extent they seek consequential

damages, attorneys' fees, and litigation costs, and moved to strike two paragraphs of the Second Amended Counterclaim. (Mot. (Dkt. No. 33))

On November 21, 2018, while XL Specialty's motion was <u>sub judice</u>, the parties jointly sought leave for XL Specialty to amend its Complaint and for Prestige to file a Third Amended Answer and Counterclaim in response to the new pleading. (Nov. 21, 2018 Jt. Ltr. (Dkt. No. 41)) The Court granted permission to file amended pleadings, and denied Plaintiff's motion to dismiss and to strike as moot. (Order (Dkt. No. 43))

Plaintiff filed the Amended Complaint on December 7, 2018, and Prestige filed its Third Amended Answer and Counterclaims on December 11, 2018. (Am. Cmplt. (Dkt. No. 47); Third Am. Answer and Counterclaim (Dkt. No. 48))[15]

XL Specialty then moved for summary judgment on its claims in the Amended Complaint and on Prestige's counterclaims. (Mot. (Dkt. No. 54)) XL Specialty contends that its claims are subject to admiralty jurisdiction, and to the federal maritime doctrine of "<u>uberrimae fidei</u>" or "utmost good faith" – a doctrine that requires an insured to disclose to a prospective insurer all facts that materially affect the risk of extending coverage to the insured. XL Specialty further contends that Prestige – in violation of this doctrine – did not disclose three prior marine cargo losses, and that XL Specialty – in issuing policies to Prestige – relied on information indicating that Prestige was loss-free. (Pltf. Br. (Dkt. No. 55)) Prestige denies that admiralty law applies to this lawsuit, and contends, <u>inter alia</u>, that XL Specialty knew of Prestige's prior

---

[15] The amended pleadings assert no new causes of action. Instead, the new pleadings incorporate information the parties obtained during discovery. (<u>See id.</u>; <u>see also</u> Am. Civil Case Mgmt. Plan (Dkt. No. 38))

losses but decided to extend and renew coverage in spite of Prestige's prior losses and insurance claims.[16]  (Def. Opp. Br. (Dkt. No. 64))

## DISCUSSION

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  Lesavoy v. Lane, No. 02 Civ. 10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . .  [M]ere conclusory allegations or denials . . . cannot by themselves

---

[16]  XL Specialty agrees that "if the Policies are not rescinded, the July 4, 2017 theft loss constitutes a covered loss[,] and . . . the value of the covered loss is $1,526,087, subject to set-off for XL Specialty's return of premiums paid by Prestige . . . , plus interest."  (May 2, 2018 Ltr. (Dkt. No. 65-22) at 2)

create a genuine issue of material fact where none would otherwise exist.'" <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II. <u>ANALYSIS</u>

### A. <u>Whether Admiralty Law Governs</u>

XL Specialty argues that the 2014, 2015, and 2016 Policies are maritime insurance contracts governed by federal admiralty law, and that the claims at issue here are subject to the maritime doctrine of <u>uberrimae</u> <u>fidei</u>. Pursuant to that doctrine, XL Specialty asserts that the Policies are void <u>ab</u> <u>initio</u>, because Prestige did not disclose its prior loss history. (Pltf. Br. (Dkt. No. 55) at 21-22) Prestige contends that – even assuming that there was a failure to disclose – the Policies are not maritime contracts and, accordingly, the doctrine of <u>uberrimae</u> <u>fidei</u> is not applicable.

The United States Constitution extends the federal judicial power to, <u>inter</u> <u>alia</u>, "all [c]ases of admiralty and maritime [j]urisdiction." U.S. Const. Art. III, § 2. Pursuant to federal statute, federal district courts have jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). "This grant provides for jurisdiction over claims arising from maritime contracts." <u>d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.</u>, 886 F.3d 216, 223 (2d Cir. 2018).[17]

---

[17] "'When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation.'" <u>Fed. Ins. Co. v. Great White Fleet (US) Ltd.</u>, No. 07 CIV. 2415 (GEL), 2008 WL 2980029, at *4 (S.D.N.Y. Aug. 1, 2008) (quoting <u>Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.</u>, 543 U.S. 14, 22-23 (2004)). "A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law." <u>Kirby</u>, 543 U.S. at 27. There is no suggestion here that the parties' dispute is "inherently local," however.

"[P]arties to a marine insurance contract must accord each other the highest degree of good faith," an obligation reflected in the doctrine of <u>uberrimae fidei</u>. <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 13 (2d Cir. 1986) (citing <u>Puritan Ins. Co. v. Eagle S.S. Co. S.A.</u>, 779 F.2d 866, 870 (2d Cir. 1985)) "This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk of being insured," even absent any inquiry from the insurer. <u>Id.</u> "The insured's failure to meet this stringent standard entitles the underwriter to void the policy <u>ab initio</u>." <u>In re Balfour Maclaine Int'l Ltd.</u>, 873 F. Supp. 862, 869 (S.D.N.Y. 1995), <u>aff'd</u>, 85 F.3d 68 (2d Cir. 1996). Where a contract is not maritime – and thus, not within a federal court's admiralty jurisdiction – the doctrine of <u>uberrimae fidei</u> is not applicable, however.

There are "no[] . . . clean lines between maritime and nonmaritime contracts." <u>See</u> <u>Norfolk S. Ry. Co. v. Kirby</u>, 543 U.S. 14, 23 (2004). For many years, the Second Circuit instructed district courts considering whether a claim falls within admiralty jurisdiction to conduct a "threshold inquiry" that involved "initially determin[ing] whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." <u>In re Balfour MacLaine Int'l Ltd.</u>, 85 F.3d 68, 75 (2d Cir. 1996); <u>Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.</u>, 968 F.2d 196, 200 (2d Cir. 1992). If the subject matter were not "so attenuated," the court would then inquire into the contract's subject matter. While "a contract w[ould] not sustain admiralty jurisdiction unless the contract is wholly maritime in nature," the Second Circuit set out "two exceptions to this general rule." <u>Id.</u> at 199. "First, in a contract containing both maritime and non-maritime elements, a claim under a maritime portion of a contract w[ould] sustain admiralty jurisdiction where the maritime obligations can be separately enforced without prejudice to the rest." <u>Id.</u>

(internal quotation marks and citations omitted). "Second, where the non-maritime elements are merely 'incidental' in an otherwise maritime contract, admiralty jurisdiction w[ould] encompass the entire contract." Id. (citation omitted).

In 2004, however, the Supreme Court's decision in Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14 (2004) called into question the Second Circuit's analytical framework. In Kirby, the Court addressed whether bills of lading governing the transport of goods by sea from Australia to Georgia, and then inland to Alabama, were maritime contracts. Kirby, 543 U.S. at 18-21. Emphasizing that "'[t]he boundaries of admiralty jurisdiction over contracts . . . [are] conceptual rather than spatial,'" id. at 23 (quoting Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961)) – the Court held that whether a contract is maritime "depends upon . . . the nature and character of the contract, and the true criterion is whether [the contract] has reference to maritime service or maritime transactions." Id. at 24 (internal quotation marks and citations omitted). Where the "principal objective of a contract is maritime commerce," the contract is maritime. Id. at 25. Applying this analysis, the Court held that the bills of lading were maritime contracts, "because their primary objective is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States." That the bills of lading also "call for some performance on land" – the transportation of goods between Georgia and Alabama – "does not alter the essentially maritime nature of the contracts." Id. at 24.

In light of Kirby, the Second Circuit has adjusted its analysis: "In applying what [the Second Circuit] previously called the 'incidental' exception, [courts] should focus 'on whether the principal objective of a contract is maritime commerce,' rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely incidental' to the contract." Folksamerica Reinsurance Co. v. Clean Water of New York, Inc., 413 F.3d

307, 315 (2d Cir. 2005) (internal citation omitted).  In the insurance context, "admiralty jurisdiction will exist over an insurance contract where the primary or principal objective of the contract is the establishment of policies of marine insurance."  Id. (internal quotation marks and citation omitted).   "'[U]ltimately, coverage determines whether a policy is "marine insurance," and coverage is a function of the terms of the insurance contract and the nature of the business insured.'"  Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York, 822 F.3d 620, 632 (2d Cir. 2016) (quoting Folksamerica Reinsurance Co., 413 F.3d at 317).

Here, the Court concludes that "the primary or principal objective of the [2014, 2015, and 2016 Policies] is the establishment of policies of marine insurance."[18]  Like the bills of

---

[18]  The Second Circuit has not explicitly dispensed with the "threshold inquiry" previously required, but it has remarked that "the absence of any discussion by the Supreme Court [in Kirby] of a 'threshold inquiry' akin to that found in [the Second Circuit's] precedents is notable." Folksamerica Reinsurance Co., 413 F.3d at 314.  And in d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 886 F.3d 216 (2d Cir. 2018) – the Second Circuit's most recent case addressing whether a contract is "maritime" – the court "omitted the 'threshold' inquiry altogether."  Starr Indem. & Liab. Co. v. Marine Envtl. Remediation Grp., LLC, No. 17 CIV. 9881 (LGS), 2018 WL 3611970, at *3 (S.D.N.Y. July 27, 2018) ("While Defendant asserts that a two-step inquiry is necessary, the Second Circuit has explicitly called this approach into question."). Nevertheless, courts since Kirby have often conducted a "threshold inquiry," typically observing that – whether or not such an inquiry is required – the claim at issue would still be construed as maritime in nature.  See, e.g., Folksamerica Reinsurance Co. 413 F.3d at 313; Fireman's Fund Ins. Co., 822 F.3d at 635 ("Assuming that the threshold inquiry survives Kirby, the dispute here is sufficiently maritime in nature to withstand that inquiry."); Starr Indem. & Liab. Co., 2018 WL 3611970, at *3 ("In any event, the dispute at hand would satisfy the 'threshold' inquiry . . . .").

This Court believes that the previously required "threshold inquiry" is inconsistent with Kirby, for reasons explained in New Hampshire Ins. Co. v. Home Sav. & Loan Co. of Youngstown, Ohio, 581 F.3d 420 (6th Cir. 2009):

   [W]e have serious reservations as to whether the focus of th[e] "threshold inquiry" can be squared with controlling Supreme Court precedent. . . . [T]he Supreme Court has never endorsed an inquiry into the subject matter of the dispute, despite its long history of dealing with precisely the types of claims at issue here. . . . Instead, the Supreme Court consistently has held that the nature and subject-matter of the contract at issue should be

lading in Kirby, the "primary objective" of the insurance policies at issue is to facilitate "the transportation of goods by sea from [abroad] to the eastern coast of the United States." Kirby, 543 U.S. at 25. The Policies – which are expressly labeled "Ocean Marine Cargo" policies – provide coverage for goods "ship[ped] . . . at and from ports and/or places in the world to and at ports and/or places in the world directly or via ports and/or places in any order. . . ." (2014 Policy (Dkt. No. 63-3) at 14; 2015 Policy (Dkt. No. 63-4) at 15; 2016 Policy (Dkt. No. 63-5) at 15) As discussed above, the Policies are replete with the terminology of maritime commerce. Moreover, the "nature of the business insured" – a company that imports more than half of its inventory from overseas, nearly all of which is shipped to the United States via ocean-going vessels (Pltf. R. 56.1 Stmt. (Dkt. No. 56) ¶ 12; Sunkara Dep. (Dkt. No. 63-2) at 77) – supports the conclusion that the "principal objective of [the] contract[s] [at issue] is maritime commerce." Folksamerica Reinsurance Co. 413 F.3d at 315; see also Ohio Cas. Ins. Co. v. CNA / Cont'l Ins. Co., No. 2:18-CV-01385-SJO-JC, 2018 WL 6017894, at *4 (C.D. Cal. Nov. 6, 2018) (insurance dispute involved a theft of goods that had been shipped from China to the United States, and then

---

the crucial consideration in assessing admiralty jurisdiction. . . . By inquiring into the nature of the particular dispute, the ["threshold inquiry"] improperly narrows the scope of our maritime jurisdiction by effectively raising the bar for plaintiffs. . . . [This limitation] . . . ignores clear Supreme Court authority to the contrary. . . . We take the Supreme Court at its word that our inquiry should be focused on the nature and character of the contract as a whole.

Id. at 425-26 (internal quotation marks, citations, and emphasis omitted)

In any event, the crux of the dispute here is information Prestige provided – or did not provide – to Plaintiff XL Specialty in the course of obtaining maritime cargo insurance. Plaintiff's attempt to rescind the policies on the basis of alleged misrepresentations "has more than a speculative and attenuated connection to maritime commerce." Fireman's Fund Ins. Co., 822 F.3d at 635 (internal quotation marks and citation omitted); see also id. at 634 ("Moreover, the parties' dispute here concerns information provided to an insurer for pollution coverage for a structure used in vessel repair and maintenance. These questions directly implicate the business of maritime commerce.").

stored in a California warehouse; the insured had obtained a marine cargo insurance policy containing a warehouse coverage endorsement; the court "applie[d] federal admiralty law," because "the [p]olicy at issue is a marine open cargo insurance policy").

Prestige's arguments to the contrary are not persuasive. Prestige argues that "[f]or nearly a century, the law in this Circuit has found that storage risks are not maritime concerns. . . ." (Def. Br. (Dkt. No. 64) at 12) But nearly all the cases Prestige relies on are pre-Kirby. Prestige cites only one case that post-dates Kirby, and that case – Fabrique Innovations, Inc. v. Fed. Ins. Co., 2018 U.S. Dist. LEXIS 218751 (S.D.N.Y. Dec. 20, 2018) – does not support Prestige's position. Fabrique Innovations does not address whether the insurance policy at issue is a maritime contract, because both sides litigated the case on the assumption that New York law applied. (See Fabrique Innovations, Inc. v. Fed. Ins. Co., No. 17 Civ. 737 (GBD) (GWG) (Dkt. Nos. 40, 49))

Prestige also points to language in post-Kirby decisions stating that courts should "'measure[] . . . the dimensions of the contingency insured against and the risk assumed[]' [to] determine[] the nature of the insurance." (Def. Br. (Dkt. No. 64) at 16 (quoting Folksamerica Reinsurance Co., 413 F.3d at 317)) Prestige contends that "the contingency for land-based storage is far and away the largest risk exposure for XL [Specialty]." (Id.) While it is true that, in the 2016 Policy, the maximum liability for "shipments by any one vessel and connecting conveyances" is $2 million, while the limit of liability for a loss at the Hillsborough warehouse is $7 million (2016 Policy (Dkt. No. 63-5) at 14, 30), the difference in the liability limits does not transform the "dimensions of the contingency insured against and the risk assumed" from maritime to non-maritime.

The storage of goods that were shipped from overseas cannot be divorced from the shipping of those goods.[19]  As the Supreme Court has recognized, "[m]aritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations."  Kirby, 543 U.S. at 25.  Indeed, in Kirby, the Court instructed that "[t]he popularity of th[e] efficient choice[] to assimilate land legs into international ocean bills of lading[] should not render bills for ocean carriage non[-]maritime contracts."  Id.  Likewise, the "efficient choice" to provide insurance coverage for the storage of goods imported by sea in the same insurance policy that covers the marine shipment of those goods "should not render the [insurance policy] a non[-]maritime contract."

In any event, while the liability limit for warehouse storage is higher than the liability limits found elsewhere in the 2016 Policy, the "contingency insured against" in the Warehousing Coverage endorsement – which excludes myriad potential causes of loss (2016 Policy (Dkt. No. 63-5) at 30) – pales in comparison to the variety of maritime shipping-related risks covered by the 2016 Policy.  (Id. at 18-20)  And while Prestige contends that XL Specialty "treated the risk presented by the warehouse's land-based storage risk with far greater importance than any transit risk," Def. Br. (Dkt. No. 64) at 17, that assertion is belied by the evidence that XL Specialty did not order a survey of Prestige's warehouse until 2016.  (See Myers Dep. (Dkt. No. 65-3) at 4)

The Court concludes that the 2014, 2015, and 2016 Policies are maritime contracts, and are governed by federal admiralty law.[20]

---

[19]  Approximately two-thirds of the goods in Prestige's warehouse at the time of the 2017 theft had been shipped from abroad.  (See Summary of Inventory (Dkt. No. 63-2) at 107)

[20]  Even if the Policies were not maritime contracts, admiralty law would still govern, given the choice of law provision in the Warehouse Coverage Endorsements stating that "any dispute

B. **Whether the Parties Contracted Around the Duty of *Uberrimae Fidei***

Prestige argues that even if the Policies constitute maritime contracts to which the doctrine of <u>uberrimae</u> <u>fidei</u> typically applies, "the Cargo Policy contracts out of the doctrine of <u>uberrimae</u> <u>fidei</u>." (Def. Br. (Dkt. No. 64) at 28) Prestige points to the following language:

> [t]he proposed insured affirms that the foregoing information is true and agrees that these applications [for insurance] shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy.

(Def. Br. (Dkt. No. 64) at 29 (citing 2016 Policy (Dkt. No. 63-5) at 7) (emphasis omitted))

This language is found in the "Fraud Notice" contained within the "Notice to Policyholders" section of the 2016 Policy. The Fraud Notice consists of a state-by-state chart of language that the various states require in connection with the submission of insurance applications and claims. (2016 Policy (Dkt. No. 63-5) at 6-8)

The Second Circuit has not addressed whether parties may contract around the doctrine of <u>uberrimae</u> <u>fidei</u>, and no trend is apparent from a survey of other circuits. <u>Compare King v. Allstate Ins. Co.</u>, 906 F.2d 1537, 1541 (11th Cir. 1990) ("Although clearly there are maritime issues involved in this dispute, we believe the issue central here is whether the courts will allow the parties to decide for themselves what rules will govern their business affairs. There being no public policy problem whatsoever in parties to a maritime insurance contract setting the terms of the policy between them, we uphold their freedom to do so.") <u>with New</u>

---

arising hereunder shall be adjudicated according to the substantive United States Federal Admiralty Law and practice. . . ." <u>See</u>, <u>e.g.</u>, 2014 Policy (Dkt. No. 63-3) at 25; <u>see also</u> <u>Fireman's Fund Ins. Co. v. Great Am. Ins. Co.</u>, 10 F. Supp. 3d 460, 488 n.16 (S.D.N.Y. 2014) ("Even if the Pollution Policy were not a maritime contract, <u>uberrimae</u> <u>fidei</u> would apply because the policy requires that it 'shall be construed pursuant to, and the rights of the parties hereto shall be governed and controlled by, the general maritime law of the United States[.]' . . ."), <u>aff'd sub nom.</u> <u>Fireman's Fund Ins. Co.</u>, 822 F.3d 620 (2d Cir. 2016).

Hampshire Ins. Co. v. C'Est Moi, Inc., 519 F.3d 937, 938-39 (9th Cir. 2008) ("It's an open question in this circuit whether parties may modify or eliminate an insured's uberrimae fidei obligation through terms in the insurance policy. However, if this were possible at all, it would certainly require very clear policy language, unequivocally disclosing a mutual intent to supersede the insured's common law obligation. . . . This clause here comes nowhere close: It does not mention uberrimae fidei or its colloquial equivalent, the 'duty of utmost good faith,' and it doesn't purport to supersede other rights and responsibilities the parties may have vis-à-vis each other by operation of law.")

The Court need not resolve whether parties may contract out of the doctrine of uberrimae fidei, or what specificity and clarity of language would be required to do so, because the language on which Prestige relies cannot reasonably be construed – under any standard – as contracting out of that duty. The Fraud Notice cannot be construed as part of the Policies: it contains myriad distinct formulations of warnings to policyholders, some of which are directed to types of insurance – such as worker's compensation and automobile insurance – that are completely unrelated to the marine cargo insurance provided in the 2016 Policy. (2016 Policy (Dkt. No. 63-5) at 7-8) Indeed, the language Prestige quotes – which is found in the New York section of the chart, with the heading "Fire" – appears to relate to the "anti-arson application" that New York law requires insureds to complete and provide to insurers furnishing fire insurance. See 11 NYCRR 62-4.2(d) (anti-arson application, containing language identical to that cited by Prestige). Accordingly, the language in the Fraud Notice provides no basis for concluding that the parties contracted around the duty of uberrimae fidei.[21]

---

[21]  Prestige also contends that the "Errors & Omissions" clause of the Policies – which provides that "[i]t is agreed that this insurance shall not be prejudiced by any unintentional delay or

## C.    Whether Frenkel Is XL Specialty's Agent

As discussed above, there is evidence that Prestige disclosed prior losses to Frenkel.  (See, e.g., Sunkara Dep. (Dkt. No. 63-2) at 87-88)  Prestige argues that Frenkel was acting as XL Specialty's agent, and that Frenkel's knowledge of Prestige's losses is imputed to XL Specialty.  (Def. Opp. Br. (Dkt. No. 64) at 25)

"Under New York law, an insurance broker . . . generally [is] considered the agent of the insured, not the agent of the insurer."  Centrehigh Ltd. v. Chubb & Son Inc., No. 10 CIV. 3792 (CM), 2012 WL 13042572, at *12 (S.D.N.Y. Feb. 3, 2012) (citing MTO Assoc., Ltd. Partnership v. Republic-Franklin Ins. Co., 21 A.D.3d 1008, 1008 (2d Dept. 2005); Matter of First Cent. Ins. Co., 3 A.D.3d 494, 495 (2d Dept. 2004)).  Where a broker is the insured's agent, "notice to the broker is not deemed notice to the insurance company."  MTO Assoc., Ltd. Partnership, 21 A.D.3d at 1008; see also S. New Jersey Rail Grp., LLC v. Lumbermens Mut. Cas. Co., No. 06 Civ. 4946 (LAK) (AJP), 2007 WL 2296506, at *12 (S.D.N.Y. Aug. 13, 2007) (collecting cases), report and recommendation adopted, S. New Jersey Rail Grp., LLC v. Lumbermens Mut. Cas. Co., 2007 WL 2609894, at *2 (S.D.N.Y. Sept. 5, 2007).

The general rule is not without exceptions, however, and "a broker will be held to have acted as the insurer's agent where there is some evidence of action on the insurer's part, or facts from which a general authority to represent the insurer may be inferred."  Fid. & Guar. Ins.

---

omission in reporting hereunder or any unintentional error in the amount or the description of the goods, vessel or voyage or if the subject matter of the insurance be shipped by another vessel, if prompt notice be given the insurer as soon as said facts become known to the Insured" (2016 Policy (Dkt. No. 63-5) at 23) – does not permit rescission where material non-disclosures are unintentional.  (Def. Opp. Br. (Dkt. No. 64) at 28)  The language cited by Prestige plainly applies to errors and omissions in loss claims submitted pursuant to the policy, and not to errors and omissions in information provided to the insurer for the purpose of procuring coverage in the first place.

Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133, 140–41 (2d Cir. 2008) (quoting

Rendeiro v. State-Wide Ins. Co., 8 A.D.3d 253, 253 (2d Dept. 2004) (internal quotation marks

and citation omitted)).  Prestige contends that the Producer Agreement Frenkel and XL Specialty

executed constitutes the requisite "some evidence" from which Frenkel's authority to represent

XL Specialty can be inferred.  (Def. Opp. Br. (Dkt. No. 64) at 25-28)

   The existence of an agreement between a plaintiff-insurer and a broker may raise

a material dispute as to whether a broker was acting as an agent for the insurer – or even

establish as a matter of law that the broker was acting on behalf of the insurer.  In Fid. & Guar.

Ins. Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133 (2d Cir. 2008), for example, the

plaintiff insurance company and a broker had executed an "Agency Agreement"; this agreement

gave the broker authority to, inter alia, "accept applications for insurance; . . . bind the [insurance

company] on coverages; . . . issue, endorse, provide certificates of insurance and cancel contracts

for insurance; . . . [and] pay claims"; the agreement also required the broker to "promptly report

all claims and deliver all relevant claims information" to the insurance company, and to "provide

reliable underwriting information . . . ."  Fid. & Guar. Ins. Underwriters, 540 F.3d at 136-37.

The Second Circuit ruled as a matter of law that "[t]hese clear delegations of authority . . .

establish [the broker's] authority to represent [the insurance company]."  Id. at 140.  By contrast,

in Travelers Ins. Co. v. Raulli & Sons, Inc., 21 A.D.3d 1299 (4th Dept. 2005), the Fourth

Department "conclude[d] that there [was] a triable issue of fact concerning whether [a broker]

acted as [the insurers'] agent . . . or as [the insured's] agent," "given the existence of an express

agency agreement between plaintiffs and [the broker] and the evidence of action on plaintiffs'

part in supplying data to [the broker] to enable it to solicit [the insured's] business on behalf of

plaintiffs."  Travelers Ins. Co., 21 A.D.3d at 1300.

The Producer Agreement between Frenkel and XL Specialty is not an "express agency agreement." Indeed, the Producer Agreement states that Frenkel "acknowledges that it is an agent of the insured and not an agent of [XL Specialty]. [Frenkel] will at all times act solely in the capacity of a broker on behalf of the insureds." (Producer Agreement (Dkt. No. 63-6) at 100)[22] Nor does the Producer Agreement permit Frenkel to "bind [XL Specialty], alter[,] or cancel any coverage in the absence of specific authorization to do so." (Id. at 97) Given this language, XL Specialty maintains that "Frenkel was not XL's agent as a matter of law." (Pltf. Reply Br. (Dkt. No. 60) at 5; see also id. at 10 ("[T]he . . . . Producer Agreement sets forth . . . that Frenkel was not XL's agent and that it acted solely as a broker on behalf of insureds. . . . Furthermore, no provision of the Producer Agreement granted Frenkel authority to act on XL's behalf in underwriting, quoting or binding insurance for Frenkel's policyholder clients."))

The evidence of an agency relationship need not be as strong as in Fid. & Guar. Ins. Underwriters or Travelers Ins. Co. to raise a factual dispute sufficient to defeat summary judgment, however. See, e.g., Bennion v. Allstate Ins. Co., 284 A.D.2d 924, 925 (4th Dept. 2001) ("[P]laintiff submitted evidence that Allstate had informed [the insured] that he should '[c]ontact [his] agent, broker, or producer of record if [he had] any questions about [his] insurance coverage,' thereby raising an issue of fact whether Allstate held [the broker] out as its agent."); U.S. Underwriters Ins. Co. v. Landau, 679 F. Supp. 2d 330, 343 (E.D.N.Y. 2010) (finding an agency relationship between insurer and broker where the broker "was contractually

---

[22]  A contractual clause stating that a person or entity is or is not an agent is, of course, not dispositive of the issue. See, e.g., N. Shipping Funds I, LLC v. Icon Capital Corp., 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013) ("[L]abels are not dispositive[;] rather[,] the facts and circumstances of the parties' relationship determines whether an agent-principal relationship exist[s]."); Fed. Ins. Co. v. PGG Realty, LLC, No. 06 Civ. 2455 (JSR), 2007 WL 1149245, at *6 (S.D.N.Y. Apr. 17, 2007) ("[contractual] labels" designating an entity or individual as an "agent" "are not dispositive"), aff'd sub nom. Fed. Ins. Co. v. Keybank Nat. Ass'n, 340 F. App'x 5 (2d Cir. 2009).

permitted and, for some purposes, obligated to collect premiums, create daily underwriting reports, and . . . report accidents"), on reconsideration, No. 05-CV-2049 (ENV) (SMG), 2010 WL 2517196 (E.D.N.Y. June 9, 2010); Fed. Ins. Co. v. Distinguished Properties Umbrella Managers Inc., 721 F. Supp. 2d 293, 300 (S.D.N.Y. 2010), as amended (July 12, 2010) (a broker may be an agent of the insurance carrier where "the carrier executed a contract with the broker that required the broker to write insurance, receive premiums, adjust losses, and salvage goods, and . . . the broker had a duty to remit premiums and other payments to the carrier" (citing Ins. Co. of N. Am. v. Whitlock, 216 A.D. 78, 214 (1st Dept. 1926)).

In Erie Painting & Maintenance, Inc. v. Illinois Union Ins. Co., 876 F. Supp. 2d 222 (W.D.N.Y. 2012), for example, the district court concluded that the agency status of a broker could not be resolved on summary judgment where an agreement between the insurance company and the broker provided that the broker (1) "must promptly notify [the insurer] if [the broker] receives any notice of claims" and "cooperate with [the insurer] in the investigation, adjustment, and settlement of claims"; (2) "may communicate the terms of the insurance quotations to potential customers if quotations are provided by [the insurer]"; (3) "must collect, account for, and pay premiums on business it writes. . . ."; (4) "must hold such premiums in a fiduciary capacity for [the insurer]"; and (5) "must maintain records and make them accessible to [the insurer] upon [the insurer's] request." The agreement also provides that the broker "must indemnify [the insurer] for any violation of th[e] agreement." Erie Painting, 876 F. Supp. 2d at 230. The district court explained that although other factors weighed against finding that an agency relationship existed between the broker and the insurance company, the "conflicting evidence regarding [the broker's] and [the insurer's] relationship precludes summary judgment." Id.

The Producer Agreement here is very similar to the agreement at issue in

in Erie Painting. Indeed, the Producer Agreement contains all of the features the Erie Painting

court highlighted as indicative of an agency relationship. As with the agreement in Erie

Painting, the Producer Agreement makes Frenkel responsible for (1) "[r]eceiv[ing] and

report[ing] promptly to [XL Specialty] all known or reported claims, losses, or notices thereof,

made pursuant to the terms of any binder, certificate of insurance, or insurance policy issued by

or on behalf of [XL Specialty]"; (2) "[i]ssu[ing] and sign[ing] Certificates of Insurance, as

approved by" XL Specialty; (3) "[c]ollect[ing], account[ing] for[,] and pay[ing] premiums . . .

for business placed with" XL Specialty," which premiums (4) must "be[] held by [Frenkel] in a

fiduciary capacity"; and (5) "keep[ing] records of all transactions affecting business written on

behalf of [XL Specialty]," and allow[ing] XL Specialty "at all reasonable times [to] inspect and

copy all records maintained by [Frenkel] pursuant to th[e] [Producer] Agreement." The Producer

Agreement also contains a mutual indemnity and release clause that requires each side to

"indemnity, defend and hold harmless" the other "for losses, costs and expenses" incurred in

connection with the party's conduct pursuant to the Producer Agreement. (Producer Agreement

(Dkt. No. 63-6) at 97-103)[23]

---

[23] There is other evidence suggesting that an agency relationship between XL Specialty and Frenkel existed. For example, the quotes XL Specialty issued to Prestige list Frenkel together with XL Specialty under the heading "Insurer & Producer." (See 2014 Quote (Dkt. No. 63-7) at 26-27; 2015 Quote (Dkt. No. 63-7) at 59-60; 2016 Quote (Dkt. No. 63-8) at 17-18) Moreover, XL Specialty's quotes state that they are "based upon . . . information received in the submission provided by [Frenkel employee] Tom Votinelli," 2016 Quote (Dkt. No. 63-8) at 17, while the Policies state that coverage is "in reliance on the information and representations [Prestige] [has] give[n] [to XL Specialty] or one of [its] authorized representatives" (2014 Policy (Dkt. No. 63-3) at 15; 2015 Policy (Dkt. No. 63-4) at 16; 2016 Policy (Dkt. No. 63-5) at 16) Considered together, there is sufficient evidence to create a material issue of fact as to whether Votinelli was an "authorized representative" of XL Specialty. Finally, XL Specialty's quotes provide that Frenkel will receive a commission amounting to 17.5% of Prestige's premium; the Producer

To be sure, XL Specialty has offered evidence indicating that no agency relationship existed between it and Frenkel, including deposition testimony from Frenkel and XL Specialty employees. (See D'Alessio Dep. (Dkt. No. 65-6) at 26; Votinelli Dep. (Dkt. No. 63-6) at 28) But "credit[ing] all factual inferences that could rationally be drawn[]in favor of the party opposing summary judgment," Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)), the "conflicting evidence regarding [Frenkel] and [XL Specialty's] relationship precludes summary judgment" on this issue. Erie Painting, 876 F. Supp. 2d at 230.

D.      **Whether the Disclosure in the RRI Report Precludes Summary Judgment**

Because there is a material issue of fact as to whether Frenkel was acting as XL Specialty's agent, this Court cannot resolve – as a matter of law – what knowledge of Prestige's prior losses – if any – can be imputed to XL Specialty by virtue of Prestige's disclosures to Frenkel. Prestige contends, however, that irrespective of the agency issue, XL Specialty became aware of Prestige's loss history as a result of the 2016 RRI Report.

In Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir. 1985), the Second Circuit held that "[t]he principle of uberrimae fidei does not require the voiding of [a] contract unless the undisclosed facts were material and relied upon." Puritan Ins. Co., 779 F.2d at 871. Relying on Puritan Ins. Co., Prestige contends that "[i]n this Circuit" – even where the doctrine of uberrimae fidei applies – "an insurance company cannot ignore post-application loss information" in seeking to rescind a policy on the ground that the insured failed to disclose loss information. (Def. Opp. Br. (Dkt. No. 64) at 21) XL Specialty responds by asserting that "to the

---

Agreement states that the commission is paid by XL Specialty. (2014 Quote (Dkt. No. 63-7) at 27; 2015 Quote (Dkt. No. 63-7) at 60); 2016 Quote (Dkt. No. 63-8) at 18; Producer Agreement (Dkt. No. 63-6) at 99-100)

extent that Prestige attempted to disclose [a] [l]oss to RRI, its disclosure was false or, at best, misleadingly incomplete," because the RRI report lists the loss amount for the 2010 loss at only $200,000 – when Prestige claimed over $790,000 in lost inventory.  XL Specialty further argues that, in any event, the 2010 loss "is only one of the three prior losses that Prestige failed to disclose to XL. . . . Prestige cannot satisfy its duty of utmost good faith by making an inaccurate and incomplete disclosure of certain material information while failing to disclose other material information."  (Pltf. Br. (Dkt. No. 55) at 27)

As to the alleged "misleading[]" and "incomplete" nature of Prestige's disclosures to the RRI surveyor, whether Sunkara informed Karalovich – the RRI surveyor – that the loss amount for the 2010 theft was $200,000 is disputed.  Sunkara testified that he does not recall informing Karalovich of "specific [dollar] amounts" related to the 2010 loss.  (Sunkara Dep. (Dkt. No. 65-8) at 15).  Moreover, as D'Alessio explained at deposition, "the survey [report] is not filled in by . . . the policyholder," but instead "is written by the RRI [surveyor]."  (D'Alessio Dep. (Dkt. No. 65-6) at 25)

The Second Circuit has held that an insured party complies with its obligations under the doctrine of <u>uberrimae fidei</u> where it "discloses [information] sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it."  <u>Puritan Ins. Co.</u>, 779 F.2d at 871 (internal quotation marks and citation omitted).  Here, D'Alessio testified that the $200,000 loss that was disclosed in RRI's report was a "large loss" that constituted "a material risk exposure to an underwriter at XL [Specialty]."  (D'Alessio Dep. (Dkt. No. 65-6) at 27)  There is evidence that both Nolan and D'Alessio accessed the RRI Report, and D'Alessio testified that it would have been his practice to read the report.  (<u>Id.</u> at 24)  There is also evidence that the RRI Report was commissioned and prepared "for the purpose of

assisting XL [Specialty] to underwrite the risk for Prestige." (Myers Dep. (Dkt. No. 65-3) at 4)

Accordingly, the disclosure of such a large loss in the RRI Report – even if the loss was

understated – appears "sufficient to call the attention of the underwriter" such that the

underwriter could seek further information about the loss.[24] Nevertheless, XL Specialty

proceeded to bind the 2016 Policy. The fact that XL Specialty decided to bind the 2016 Policy

even with knowledge of a $200,000 loss raises issues about whether the much smaller loss

claims cited by XL Specialty – which total approximately $51,577 (see Pltf. R. 56.1 Stmt. (Dkt.

No. 56) ¶¶ 48-52; March 2012 Loss Claim (Dkt. No. 63-6) 63-70; Jan. 2013 Loss Claim (Dkt.

No. 63-6) at 72-80) – are material.

It is also worth noting that D'Alessio opened the RRI Report on August 19, 2016,

while D'Alessio was familiarizing himself with the Prestige file and four days after Frenkel had

reported to XL Specialty that there were "[n]o known or unreported losses" for purposes of the

upcoming policy renewal. (Aug. 15, 2016 Email Chain (Dkt. No. 63-8) at 11) Given that the

---

[24] XL Specialty cites cases for the proposition that "an insured's misleading or incomplete disclosure does not meet the standard of a sufficient disclosure discussed in Puritan" (see Pltf. Br. (Dkt. No. 55) at 27-28), but these cases do not involve comparable facts. In Royal Ins. Co. of Am. v. Cathy Daniels, Ltd., 684 F. Supp. 786 (S.D.N.Y. 1988), for example, the insured's agent not only misreported the amount of a prior claim, but also failed to disclose that the prior insurer had effectively canceled the insured's policy, and that the insured's predecessor company "had a long and substantial loss history marked by litigation involving insurance carriers and brokers." Id. at 791. Similarly, in American Home Assurance Co. v. Masters' Ships Mgmt. S.A., 423 F. Supp. 2d 193 (S.D.N.Y. 2006), aff'd, 489 F.3d 497 (2d Cir. 2007), it was clear that the insured had not met its disclosure obligations: the insurer's "policy was not to consider single-vessel risks as new or renewal business," and the insured falsely represented that it had a multiple-vessel fleet, when instead it had only a single vessel. Id. at 201-02, 222. Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA, 599 F. Supp. 405, 427 (S.D.N.Y. 1984) – also cited by XL Specialty – was decided before Puritan Ins. Co. Accordingly, this case is of no assistance in determining what sort of disclosures are sufficient under Puritan Ins. Co. In sum, XL Specialty has not demonstrated as a matter of law that the information reflected in the RRI Report as to loss history is too "misleading[]" or "incomplete" to qualify as a disclosure for purposes of Prestige's obligations under the doctrine of uberrimae fidei.

RRI Report explicitly contradicts earlier representations that Prestige had no loss history, XL Specialty has not demonstrated as a matter of law that "the [allegedly] undisclosed facts were material and relied upon" in issuing the Policies.

Crediting all factual inferences in favor of Prestige, the evidence is sufficient to create a material issue of fact as to whether Prestige's non-disclosure of its prior losses was material.  See Puritan Ins. Co., 779 F.2d at 871.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment was granted only to the extent that the Court ruled that the 2014, 2015, and 2016 Policies are maritime contracts. Plaintiff's motion for summary judgment was otherwise denied.

This case will proceed to trial on November 12, 2019, as previously scheduled.

Dated:  New York, New York
          November 8, 2019                             SO ORDERED.

                                                       Paul G. Gardephe
                                                       United States District Judge